CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
SEP 19 2005
JOHN F. GORCORAN, CLERK
BY: DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KAREN D. CECIL, | ) |
| Plaintiff, | ) Case No. 7:05CV00003 |
| v. | ) |
| RELIANCE STANDARD LIFE INSURANCE COMPANY, *and* SINGER FURNITURE COMPANY LONG TERM DISABILITY PLAN, | ) MEMORANDUM OPINION AND ORDER |
| | ) By: The Honorable James C. Turk |
| | ) Senior United States District Judge |
| Defendants. | ) |

This case is before the Court on a Motion for Summary Judgment filed by the plaintiff, Karen D. Cecil. At issue is whether the defendant, Reliance Standard Life Insurance Company's decision that the plaintiff is ineligible for long-term disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. § 1001 *et seq.*, was supported by a lack of sufficient evidence of plaintiff being disabled. The Court has considered the evidence and for the following reasons, the plaintiff's motion for summary judgment is **Denied**. The case is **Remanded** for further consideration by the defendant, Reliance Standard Life Insurance.

I.

Cecil began working for Singer Furniture Company ("Singer") in April 1972. For a majority of her time there, she worked as a Customer Service Representative. As a Singer employee, she was eligible to be covered under the Singer Furniture Company Long Term Disability Plan ("Plan"), in which Reliance Standard Life Insurance Co. ("Reliance") was both

1

the benefit claims administrator and Plan insurer.

On October 10, 1996, Cecil became unable to work because, *inter alia*, she suffered from migraine headaches and fibromyalgia. AR-887. Although she had suffered migraines since the early 1980s, the frequency and severity of her headaches started to increase in 1995 and eventually made it impossible for her to continue full-time employment. AR-820. Additionally, Cecil's headaches sometimes were accompanied by nausea, vomiting, and sensitivity to light (photophobia) and sound (phonophobia). AR-091 & 228.

On November 21, 1996, Cecil submitted a claim for Long-Term Disability ("LTD") benefits. AR-887-88. Reliance approved her claim, and awarded benefits retroactively effective on April 19, 1997. AR-703-04. Reliance told Cecil that she would continue to receive benefits until April 19, 2002 or until she was no longer disabled, whichever came first. AR-703. Reliance also told her that to receive benefits after April 2002, she would have to "be Totally Disabled from *any* occupation." *Id.*

On February 24, 2004, Reliance advised Cecil that it had determined she was no longer Totally Disabled from any occupation, and it would deny further benefits. AR-243-44. Reliance based its decision on Cecil's performance in a December 9, 2003 Functional Capacity Evaluation ("FCE"), AR-243-315, and a review of her medical records by Dr. Steven J. Feagin, M.D., that concluded that Cecil was able to perform sedentary or light work on a full-time basis and that there was a lack of evidence of the illnesses, such as fibromyalgia and migraines, that Cecil claimed. AR-243. Cecil filed a timely appeal, AR-239-40, and sent additional evidence chronicling the frequency and severity of her headaches. AR-083-237. Reliance denied the appeal, however, because it said Cecil had a demonstrated physical capacity for full-time

2

sedentary to light work, and no medical evidence existed that she had a psychiatric impairment or medication-induced impairment that would prevent work function. AR-017-19.

Cecil brought this action because she believes the evidence is inadequate to support Reliance's decision to deny her benefits. She alleges that Reliance failed to consider the impact of her migraine headaches on her ability to work any occupation. Cecil also states that Reliance inappropriately used the December 2003 FCE to deny her benefits because she claims that a FCE cannot holistically measure her disabling condition.[1] In addition, Cecil alleges that Reliance inappropriately considered information relating to another person with the plaintiff's same name during Reliance's review of Cecil's claim.

Reliance responds, however, that it acted properly in denying the benefits because Cecil did not provide objective evidence of disability that would classify her as Totally Disabled under the Plan and unable to work "any occupation."

## II.

Upon motion for summary judgment, the Court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 236-37 (4th Cir. 1995). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). However, "[t]he mere existence of some alleged factual

---

[1] Cecil states that the FCE can measure her physical ability to move, but not her non-exertional impairments that prevent her from working full-time. In other words, she may be able to physically perform tasks at a sedentary – and perhaps even a light exertional – level, but the frequency and severity of her headaches prevent her from full-time employment.

3

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise present specific facts showing that there is a genuine issue of disputed fact for trial. *Id.* If the non-moving party fails to show a genuine issue of fact, summary judgment, if appropriate, may be entered against the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## III.

It is well-established that a court reviewing the denial of disability benefits under ERISA must initially decided whether the language of the benefit plan grants the plan administrator discretion to determine the claimant's eligibility for benefits, and if so, whether the administrator acted within the scope of that discretion. *Gallagher v. Reliance Standard Life Insurance Co.*, 305 F.3d 264, 268 (4th Cir. 2002). Where the plan does not grant the administrator discretion, the Court reviews the plan administrator's decision *de novo*. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Here, Reliance concedes that the Plan does not give it discretionary authority. Thus, a *de novo* standard of review will be applied.

Under a *de novo* standard, the Court will interpret the Plan in accordance with the principles of contract law by ascertaining the intent of the parties and resolving ambiguities.

4

*Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir. 1992). Additionally, the Court will construe the plan's terms without deferring to either party's interpretation. *Tester v. Reliance Standard Life Ins. Co.*, 228 F.3d 372, 375 (4th Cir. 2000). Where a term is ambiguous, the Court will construe it against the drafter, and in accordance with the reasonable expectations of the insured. *See Wheeler v. Dynamic Engineering, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995).

The Court's other task when conducting a *de novo* review is to evaluate the evidentiary record. *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1026 -1027 (4th Cir. 1993). As part of this endeavor, the Court will weigh the evidence and make credibility findings. *Glocker*, 974 F.2d at 543.

Turning to the Plan, it provides that Reliance will pay a monthly benefit to an insured where she "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us." AR-012. It further provides that monthly benefits will terminate if the insured ceases being Totally Disabled. AR-013. Thus, the threshold issue here is whether Cecil is Totally Disabled as defined by the Plan.

The plan defines the phrase "Totally Disabled" and "Total Disability" as:

> [A]s a result of an Injury or Sickness:
> (1) during the Elimination Period and for the first 60 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>
> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be

5

>> considered Totally Disabled, except during the Elimination Period;
>
> (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and
>
> (2) after a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

AR-007.

The parties agree that the meaning of Totally Disabled as defined in section (2) is appropriate here because Cecil has received monthly benefits for over 60 months. Thus, Cecil must show that she cannot perform the duties of any occupation by proving either: (1) That Cecil can perform the material duties of any occupation only on a part-time basis; or (2) That Cecil can perform only part of the material duties of any occupation on a full-time basis.[2]

At the heart of Cecil's claim is that she is Totally Disabled because she suffers from debilitating migraine headaches that in conjunction with her physical illnesses, such as fibromyalgia, preclude her from working a regular schedule. Indeed, it is accepted wisdom that a person who experiences severe migraine headaches multiple times a week cannot maintain a regular work schedule. A vocational expert testified in Cecil's Social Security Administration

---

[2] The plan does not define "part-time", but it does provide that "'Full-time' means working for you for a minimum of 30 hours during a person's regular work week." AR-006. The Court finds that the parties intend the term "part-time" to mean working less than 30 hours during a regular work week.

6

hearing that no jobs existed in the national economy for a person who experienced one or two migraine headaches per week with Cecil's physical capacity.[3] AR-520. Thus, the issue narrows to whether there is sufficient evidence that Cecil experiences migraine headaches with a frequency and severity, in connection with any physical illnesses, that would either only allow her to perform the material duties of any occupation for less than 30 hours per work week, or only allow her to perform a part of the material duties of any occupation for 30 hours or more per week.

## IV.

Cecil has the burden to prove that she is Totally Disabled as defined by the Plan. The Plan's provision for long-term disability is described in the Benefits section, AR-012, and thus, the question of who bears the burden of proving entitlement to LTD coverage has been held to be on the claimant. *See, e.g., Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1408 (7th Cir. 1994) ("The trial court determined that because the 'medically necessary' provision of the insurance contract is set forth in the contract benefits section, as opposed to the 'exclusions' section, that [claimant] bore the burden of establishing entitlement to the insurance benefits. We agree . . . ."); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) (holding that the claimant had the burden of proof when seeking coverage under a policy where the coverage provision was set forth in the contract benefits section). Thus, the Court must determine whether

---

[3] Although the Court and Reliance are not bound by a Social Security decision, *Elliott v. Sara Lee Corporation*, 190 F.3d 601, 607 (4th Cir. 1999) (holding based on abuse of discretion standard), the evidence presented during a Social Security hearing can be considered. Reliance does not seem to dispute the conclusion of the vocational expert. Rather, Reliance disputes whether Cecil actually experiences severe migraine headaches on as frequent a basis as she claims.

7

Cecil has produced sufficient evidence to prove her claim of Total Disability.

A.

There are two components to Cecil's claim of Total Disability. The first is a non-neurologic component where Cecil asserts that she lacks the physical capacity to perform any occupation. The second is a neurologic component where Cecil asserts that her migraines prevent her from sustained ability to perform any occupation.

The evidence submitted in the administrative record to show that Cecil lacked the physical capacity to perform any occupation primarily focuses on two Functional Capacity Evaluations ("FCE") that Cecil underwent in 1997 and 2003, respectively. A FCE is an evaluation that allows an independent party to ascertain the extent to which a person is able to physically function. AR-243. Most importantly, the most recent FCE conducted on December 9, 2003 ("2003 FCE") found that Cecil symptoms were consistent with a diagnosis of fibromyalgia. AR-253. Furthermore, the 2003 FCE concluded that Cecil demonstrated the ability to work at a sedentary to light physical demand level for 8 hours a day. *Id.* The conclusions of the 2003 FCE are not refuted or questioned by Cecil and although the defendants may question whether the diagnosis of fibromyalgia is accurate, they too would agree with the FCE's conclusion that Cecil is physically able to perform sedentary to light work on a full-time basis. AR-253. If relying solely on the FCE, Cecil would undoubtedly be able to work full-time (i.e. more than 30 hours per week in a five-day work week) in her job with Singer or an occupation commensurate with her education, training or experience, if her physical capacity was the only factor. Cecil's physical limitations, however, are not her only barriers to her return to the workforce.

8

**B.**

Cecil also asserts that her neurologic impairment stemming from severe and frequent migraines precludes her from performing the material duties of any occupation on a full-time basis. According to Medline Plus, a service of the United States National Library of Medicine and the National Institutes of Health, a migraine is defined as a condition that is marked by recurrent, usually unilateral severe headache often accompanied by nausea and vomiting and followed by sleep . . . that is uncertain in origin, though attacks appear to be precipitated by dilatation of intracranial blood vessels. MEDLINE PLUS MEDICAL DICTIONARY, *available at* http://nlm.nih.gov/medlineplus/mplusdictionary.html. Evidence in the administrative record supports the conclusion that migraines can prevent a person from being able to work on a full-time basis (i.e. only on a part-time basis or cannot work at all), which neither party questions. AR-520.

The primary evidence that Cecil has proffered to support her diagnose of migraines are the medical reports submitted by various physicians that treated her, including Dr. Joseph Lemmer, a rheumatologist; and Dr. Edward A. Waybright, a neurologist. From 1997 to 2004, during which Cecil was under the primary care of Drs. Lemmer and Dr. Waybright, she was consistently diagnosed by the doctors as having migraines after they examined her. *See, e.g.,* AR-358. The diagnoses were based on physical examinations, medical questionnaires, medical history, and diagnostic exams conducted on Cecil. Their conclusion that Cecil has migraines has never wavered.

To refute the diagnosis of migraines, the defendants repeatedly point to the evidence in the administrative record, especially the 2003 FCE, that states that Cecil is qualified to perform

9

sedentary to light work on a full-time basis. The defendants, however, miss the critical point that the FCE only evaluates the physical capacity of a person to work and not any neurologic aspect. *See* AR-243. A FCE did not and cannot evaluate whether Cecil suffers from migraines and what effect that a diagnosis of migraines would have on the FCE's conclusion. The 2003 FCE explicitly stated that although Cecil may have the physical capacity to perform sedentary or light work, "the consistency of her work and absenteeism may be more related to the onset of migraines vs. her physical abilities, and thus those issues should be addressed by her medical doctor." AR-253. Although the FCE can determine Cecil's physical capacity to perform work, it does not elucidate whether Cecil has migraines and the effect of migraines on her capacity to work.

The defendants also assert that Dr. Lemmer's medical opinion should be discredited because his opinions are contradictory.[4] The Court, however, finds no inconsistency in Dr. Lemmer's reports and finds them trustworthy. The defendants state that Dr. Lemmer denoted that Cecil was "Totally Disabled" in response to questionnaires sent by Reliance. AR-336, 356 & 377. The defendants assert that Dr. Lemmer's answers to these questionnaires contradict his statements in his medical reports that conclude that Cecil could perform "light or light to medium work." Dr. Lemmer's responses, however, are entirely consistent with his opinion, in response to a Reliance claim form, that Cecil is "Totally Disabled" as defined by the Plan.

---

[4]The Court finds it peculiar that the defendants attempt to discredit Dr. Lemmer's medical opinion, and yet, the defendants utilize Dr. Lemmer's medical conclusion that the plaintiff could return to "light or light to medium work" in another portion of their brief, to support their position that they are entitled to summary judgment. Defendants' Supplemental Brief in Opposition to Plaintiff's Motion for Summary Judgment at 2. The defendants would seem to want their cake and eat it too.

10

The Plan's definition of "Totally Disabled" can be defined in several ways and changes depending on what period of time is in question. During the Elimination Period, a claimant can be considered "Totally Disabled" if she is capable of performing the material duties of her regular occupation only on a part-time basis.[5] During the first 60 months that a monthly benefit is payable, a claimant can be Totally Disabled if she is capable of performing the material duties of her regular occupation only on a part-time basis.[6] After 60 months for which a benefit has been paid, a claimant can be Totally Disabled if she is capable of performing the material duties of any occupation only on a part-time basis. In essence, the Plan's definition of Totally Disabled (unable to work) includes claimants that can work only part-time. This is entirely consistent with Dr. Lemmer's opinion that Cecil could return to light or light to medium work **on a part-time basis**. *See, e.g.* AR-495 & 590 (emphasis added). Dr. Lemmer was responding to a Reliance questionnaire in which Reliance instructed Dr. Lemmer on what is included under the rubric of "Totally Disabled" as defined by Reliance. Dr. Lemmer's evaluation of Cecil as being capable of returning to part-time work is consistent with the Plan's definition of being Totally Disabled.[7] In response to a Reliance claim form in which the form used terminology of Reliance's own

---

[5] During the Elimination Period, a claimant is Totally Disabled if she is has a Residual Disability. A Residual Disability is defined as being Partially Disabled during the Elimination Period. Partially Disabled is defined as "capable of performing the material duties of his/her occupation on a part-time basis . . . ."

[6] During the fist 60 months for which a monthly benefit is payable, a claimant is Totally Disabled if she is Partially Disabled. Partially Disabled is defined as "capable of performing the material duties of his/her occupation on a part-time basis . . . ."

[7] It would not be surprising if the defendants, or any person, misunderstood what Totally Disabled means under their own Plan since Totally Disabled includes claimants that are less than fully unable to work and, thus, differ from the plain language meaning of "totally disabled."

11

construction, of which Dr. Lemmer was familiar with, there is no contradiction when Dr. Lemmer states that Cecil was Totally Disabled because a claimant can be Totally Disabled under the Plan while being able to work part-time.

Furthermore, even if this Court were to agree with the defendants that there was an inconsistency between Dr. Lemmer's medical reports and the categories that he marked on an insurance form, Dr. Lemmer's medical reports detailing his examinations of Cecil are more revealing about what Dr. Lemmer's medical opinion of Cecil's condition is, rather than "checking the box" on a boilerplate (as defendants identify it) form that defendants admit could be misunderstood. *See Willis v. Baxter Int'l, Inc.*, 175 F. Supp. 2d 819, 832 (W.D.N.C. 2001) ("Absent a showing of vocational expertise, courts, as well as disability adjudicators, give little deference to the opinions of medical doctors on the ultimate determination of 'disability' . . . It is a doctor's medical findings, however, that are most helpful in determining what impairments are interfering with the plaintiff's ability to work."). Dr. Lemmer has repeatedly diagnosed Cecil as having migraines. *See, e.g.*, AR-384 & 386. What is more important and relevant than Dr. Lemmer's conclusion that Cecil could return to light or light to medium work on a part-time basis, is his diagnosis that Cecil has, *inter alia*, migraines. *Id.* Dr. Lemmer's medical opinions that Cecil suffers from migraines could support a finding that Cecil is Totally Disabled under the Plan.

The defendants also point to Dr. Feagin's review of Cecil's medical files and his conclusion that Cecil is able to work full-time and does not suffer from migraines (or suffers from them in a frequency and severity that would not prohibit full-time work) to refute the conclusions of Cecil's treating physicians, Drs. Lemmer and Waybright. Drs. Lemmer and

12

Waybright have attended to Cecil from 1997 to 2004. The doctors have examined Cecil in person, have been able to talk with Cecil personally about her symptoms and problems, and have a personal knowledge of her medical history and the progression of her ailments. In addition, Dr. Waybright is a neurologist and, thus, specializes in neurologic disorders such as migraines. On the other hand, Dr. Feagin is an internist without a personal patient practice for over a decade or a specialty in neurology, that has never examined or talked with Cecil in-person, and derives his conclusions from the review of medical records and tests performed by the very medical personnel that reached opposite conclusions. AR-021-27. Such factors alone would permit this Court to find Drs. Lemmer and Waybright more credible than Dr. Feagin. Dr. Feagin's conclusions, however, also are not relevant because they do not substantively refute the diagnosis of migraines that Drs. Lemmer and Waybright have repeatedly reported.

Dr. Feagin concludes in the Appeal Medical File Review ("AMFR") that there lacks evidence of headaches (or migraines) of a frequency or severity "precluding regular work attendance or performance." AR-023. Dr. Feagin bases his conclusion on the fact that there is a lack of any tangible evidence of migraines; he points significantly to the fact that a CT ("Computed Tomography") Scan and a MRI ("Magnetic Resonance Imaging") showed no abnormal findings of Cecil's brain. AR-024. The fact, however, that the CT Scan or MRI did not find any abnormalities only rules out certain causes of migraines, they do not conclusively tell whether someone has migraines or not.

A diagnostic imaging of the brain is conducted to rule out any hidden organic causes of headaches (or migraines) such as tumors or blood-vessel abnormalities. Lynne M. Constantine & Suzanne Scott, MIGRAINE: THE COMPLETE GUIDE 111 (1994) (hereinafter MIGRAINE: THE

13

COMPLETE GUIDE); *cf. Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986) ("It is a matter of common knowledge that courts occasionally consult sources not in evidence, ranging anywhere from dictionaries to medical treatises."); *Hines ex. rel. Sevier v. Secretary of the Dep't of Health and Human Servs.*, 940 F.2d 1518, 1526 (Fed. Cir. 1991) ("Well-known medical facts are the types of matters of which judicial notice may be taken." (citations omitted)). Like blood tests, these images cannot prove that a person has a migraine, they simply confirm that another illness or problem could be the cause of the head pain. *See* MIGRAINE: THE COMPLETE GUIDE at 11.

The accepted standard by which a migraine should be diagnosed in clinical practice is through the diagnostic criteria formulated by the International Headache Society ("IHS"), *available at* http://www.i-h-s.com (located in the "Guidelines" section) . *See* Dr. John H. Noseworthy, M.D., 1 NEUROLOGICAL THERAPEUTICS: PRINCIPLES AND PRACTICE 76 (2003) (hereinafter NEUROLOGICAL THERAPEUTICS). The IHS guidelines utilize a combination of diagnostic criteria to determine whether a person is suffering from one of the many types of migraines. Cecil displayed "classic" symptoms of migraines such as nausea, vomiting, photophobia, and phonophobia, as noted by various doctors that treated her. *See* AR-100-01, 129-30, 140-41, 172-73, 193-94, 214 & 228. Dr. Feagin also concurs that Cecil has "attributes" of migraines, yet then states that there lacks evidence of migraines because the brain-imaging diagnostics were normal and the claimant could "embellish" her symptoms. AR-023.

If, however, "a headache meets the IHS criteria for migraine, then for all practical purposes it is a migraine." NEUROLOGICAL THERAPEUTICS at 76. Careful studies have shown that neuroimaging of people with "IHS migraine" yields evidence of an intracranial lesion in less

14

than 1% of cases. *Id.*; *see also* Dr. Christopher G. Goetz, M.D., TEXTBOOK OF CLINICAL NEUROLOGY (2d ed. 2003) ("Patients who have normal neurological examinations and benign recurrent headaches that fit the IHS criteria of migraine do not require brain imaging."). Thus, a conclusion that a person does not suffer migraines based on a lack of abnormalities in the brain from a diagnostic imaging is premature.

In addition, the Court agrees that patients sometimes aggrandize the severity or frequency of their ailments. Here, however, Cecil has not only exhibited subjective pain as a symptom, but she has also exhibited classic tangible symptoms of migraines such as vomiting, nausea, phonophobia, and photophobia. *See* AR-100-01, 129-30, 140-41, 172-73, 193-94, 214 & 228. Certainly this Circuit has upheld the denial of ERISA benefits under an abuse of discretion standard of review based upon a lack of objective evidence; that does not, however, mean that an insurer can simply deny claims based on ailments where the symptoms are more psychological than physical. *See Laser v. Provident Life & Accident Ins.*, 211 F. Supp. 2d 645, 656 (D. Md. 2002) ("[A] diagnosis that 'turns on subjective information' is not necessarily 'less debilitating' and does not give 'a plan administrator unbridled discretion to deny such claims.'" (citations omitted)).

Dr. Feagin's conclusion that Cecil does not suffer debilitating migraines stems from the incorrect assumption that a normal brain diagnostic is proof that she does not suffer from migraines. Furthermore, Dr. Feagin is incorrect in his conclusion that there is a lack of evidence of migraines stemming from his assertion that past diagnoses have been based solely upon

15

Cecil's subjective assertions of pain.[8] As noted in reports by various doctors that treated Cecil, she exhibited tangible symptoms of migraines that are included in the diagnostic criteria for migraines as formulated by the IHS. *See* AR-100-01, 129-30, 140-41, 172-73, 193-94, 214 & 228. As mentioned previously, Cecil exhibited physical symptoms of migraines such as vomiting, nausea, phonophobia, and photophobia, and thus, it is incorrect as Dr. Feagin, and the defendants, assert that there were no physical manifestations of Cecil's migraines. While it is true that courts have no warrant to automatically accord special weight to the opinions of a claimant's physician, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003), neither must courts accord a greater deference to the opinion of the insurer's medical personnel during *de novo* review especially when the insurer's medical expert has never personally evaluated the claimant and lacks expertise in the relevant field, while the claimant's treating physician, Dr. Waybright, has evaluated her over a number of years and is a specialist in the relevant field of neurologic disorders, which migraines are classified under.[9]

Lastly, the defendants also assert that Cecil is not Totally Disabled because there is evidence that she has ridden horses and has been a participant of volunteer activities. The defendants assert that if she can perform such activities then she can perform sedentary or light

---

[8]The Court must also dismiss defendants' assertion that Cecil did not suffer from debilitating headaches because she did not go to the hospital enough. It is beyond common sense to assert that Cecil would have to go to the hospital or a medical provider each time she had a migraine to prove she had severe migraines. On the contrary, if Cecil did go to the hospital or doctor each time she experienced head pain, it would lend credibility to the assertion that she was a hypochondriac.

[9]While the Court acknowledges the attempt by the defendants' counsel to play doctor and provide the Court with his own lay medical opinion that Cecil could possibly be diagnosed with narcolepsy, such opinions are irrelevant and do not further the defendants' case.

work activities. Again, the defendants confuse two distinct and separate causes of Cecil's claimed disability. Horseback-riding and physically-intensive volunteer activities may cast doubt onto Cecil's physical exertional capacity limitations but it may or may not be relevant to a diagnosis of migraines. Migraines have various triggering mechanisms such as physical activity or stress. *See* NEUROLOGICAL THERAPEUTICS at 77-78. One person's migraines may be triggered by one mechanism but not necessarily another one. *Id.* Here, Cecil's doctors have stated that her migraines could be caused by the stress of work and have actually prescribed recreational physical activity to alleviate her stress. *See, e.g.,* AR-207, 224, 231 & 357. Horseback-riding could be a physical activity that can alleviate stress. Although a person with Cecil's physical capacity may be precluded from such activities, it does not necessarily equate to the defendant's proposition that a person that rides horses does not suffer from migraines.

V.

The Court finds the diagnosis that Cecil suffers from migraines by her various treating physicians, such as Drs. Lemmer and Waybright, are reliable and that Cecil provided satisfactory objective evidence that she suffers from migraines, that has not been contradicted by the evidence in the administrative record. The Court finds that Reliance did not consider Cecil's migraines in deciding whether she was Totally Disabled, and, thus, Cecil did not receive a full and fair review of her claim. The Court, however, has insufficient evidence from the administrative record to determine whether Cecil suffers from migraines in a frequency or severity, in conjunction with the current state of her physical capacity, to be considered Totally Disabled under the Plan.

Although the 2003 FCE provides evidence of Cecil's physical exertional capacity to

17

conduct light work full-time, there lacks any consideration in the administrative record of how Cecil's migraines may change her overall assessment of work capability. Cecil could be Totally Disabled by her migraines or it is possible that her migraines can be controlled (by medication, for instance) and still allow her to work full-time. The defendants did not consider how Cecil's migraines affected her ability to work because they dismissed her claim of migraines, and, thus, there is a lack of evidence to determine how Cecil's migraines affect her ability to work. *Cf. Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir. 1984); *Willis*, 175 F. Supp. at 832 ("Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disability measured in terms of total psychological well-being.").

Because of the lack of evidence for the Court to determine whether Cecil is Totally Disabled under the Plan because of her migraines and the defendants lack of consideration of Cecil's migraines during their decision-making process, the Court will remand this case to the defendants to determine how Cecil's migraines and her current physical capacity affect her ability to work "any occupation." The plaintiff will have the opportunity to supplement the administrative record with any new evidence that will aid the defendant in evaluating this case.

While the Fourth Circuit has indicated that remand in ERISA cases should be used sparingly, *Elliot*, 190 F.3d at 609 (applying abuse of discretion standard), it is the most appropriate course where the plan administrator failed to consider relevant information during its examination of the claim. *Cf. id.* (applying an abuse of discretion standard, the *Elliot* court stated that remand was appropriate when "the plan itself commits the trustees to consider relevant

18

information which they failed to consider . . . .").

For the reasons stated above, an appropriate order shall issue this day that:

(1) Plaintiff's motion for summary judgment is **Denied**.

(2) The case is **Remanded** to the defendant, Reliance, as plan administrator, for further consideration.

(3) The plaintiff will be afforded the opportunity to supplement the administrative record with new evidence that will aid the defendants in evaluating the plaintiff's claim.

(4) The defendant, Reliance will be allowed to request that the plaintiff submit to further medical testing, as required, to evaluate the claim.

(5) To the extent that any information concerning, or relating to, Karen D. Cecil, a person with such name that is someone other than the plaintiff, was considered by the defendants in their prior claim review, the defendants are ordered not to consider such information in their subsequent review of plaintiff's claim for disability.

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to counsel of record for both the plaintiff and the defendants.

ENTER: This 19th day of September, 2005.

_____
The Honorable James C. Turk
Senior United States District Judge

Case 7:05-cv-00003-JCT-mfu Document 22 Filed 09/19/05 Page 19 of 19 Pageid#: 140